IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| ABRAHAM MARTIN, | ) | CIVIL NO. 12-00598 SOM/RLP |
| | ) | |
|            Plaintiff, | ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART AMPCO SYSTEM |
|       vs. | ) | PARKING'S MOTION FOR SUMMARY |
| | ) | JUDGMENT |
| AMPCO SYSTEM PARKING, dba | ) | |
| AMPCO EXPRESS, DOE DEFENDANTS | ) | |
| 1-10, | ) | |
| | ) | |
|           Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| AMPCO SYSTEM PARKING, | ) | |
| | ) | |
|       Counterclaimant, | ) | |
| | ) | |
|       vs. | ) | |
| | ) | |
| ABRAHAM MARTIN | ) | |
| | ) | |
|       Counterclaim | ) | |
|       Defendant. | ) | |
| _____ | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART
AMPCO SYSTEM PARKING'S MOTION FOR SUMMARY JUDGMENT**

I.        **INTRODUCTION.**

In November 2012, pro se plaintiff Abraham Martin, a taxi driver, asserted various federal and state-law claims against Defendant Ampco System Parking relating to Ampco's January 2012 increase of taxi drivers' fees at the Honolulu International Airport and the revocation of Martin's permit to serve airport customers.

Although Martin's First Amended Complaint does not clearly state his claims, the court construes it liberally as

asserting civil rights claims under 42 U.S.C. § 1983 (Counts II to IV), or alternatively 42 U.S.C. § 1981 (Counts II to III), and state-law claims for breach of contract (Count I), intentional infliction of emotional distress in connection with the federal claims (Count V), and either further breach of contract or a tort claim relating to Ampco's allegedly retaliatory revocation of his permit (Counts VI).

Ampco now moves for summary judgment on all counts. The court grants Ampco's Motion with respect to Counts I to V, and denies the Motion with respect to Count VI.

II.     **BACKGROUND.**

Defendant Ampco has the taxi concession at the Honolulu International Airport, operating an "on-demand" taxi service for arriving visitors and residents.  Plaintiff Martin had been an on-demand taxi driver at the airport from 2005 to 2006, then again from February 2011 until his permit was revoked by Ampco on March 5, 2012.  See First Amended Complaint at 2-4, ECF No. 9-29; ECF No. 58-19.  Both parties agree that Martin is not an Ampco employee but an independent contractor.  See  Deposition of Abraham Martin at 147, ECF No. 58-14; Defendant/Counterclaimant Ampco System Parking's Memorandum in Support of its Motion for Summary Judgment on Plaintiff's Amended Complaint ("Memo in Support of Motion"), ECF No. 57-1, PageID # 1766.

There is no dispute that in February 2011, before beginning his second term as an on-demand taxi driver at the airport, Martin signed and completed a Taxi Operator's

2

Application for Permit, Taxi Service at Honolulu International Airport ("Application").  See ECF No. 58-15; Deposition of Abraham Martin at 33, ECF No. 58-13.  The Application includes a provision in which Martin agreed to:

> abide by all the laws, rules (Hawaii Administrative Rules-HAR), and policies and procedures which govern "on-demand" taxis operating at the Honolulu International Airport.  The policies and procedures as described in the "Procedures for Taxi Driver's Operating at the Honolulu International Airport" and "Rules and Penalties," including any and all subsequent additions."

ECF No. 58-15.  In his Deposition, Martin testified that he read this provision and agreed to abide by it.  Deposition of Abraham Martin at 33, ECF No. 58-13.  The Application also states that, by signing it, Martin acknowledges that he received other documents pertaining to his duties and relationship with Ampco, such as the "Procedures for Taxi Drivers Operating at the HNL" ("Procedures"), "Code of Conduct for Taxi Drivers" ("Code"), and "2011 Rules and Penalties."  ECF No. 58-15.  Martin also filled out and signed an Application the following year, which ran from June 1, 2011, to May 31, 2012.  See ECF No. 58-16.

On January 17, 2012, Ampco and the State's Department of Transportation Airports Division ("DOT") entered into a Concession Agreement for the Taxi Management Concession at the Honolulu International Airport ("Agreement"), see ECF No. 58-4, which raised the trip fee that Ampco would collect from each taxi driver for each on-demand trip from the airport.  Id. at 4.  On January 29, 2012, Karen Honda, a branch manager at Ampco, issued

a memorandum "notifying all on-demand taxi drivers that effective February 1, 2012, the State of Hawaii, Department of Transportation, Airports Division revised the Taxi Driver and Taxi Vehicle Requirements; and that, in addition, the State increased the trip ticket cost to $5 per trip."  Declaration of Karen Honda ¶ 7, ECF No. 58-1.  Honda instructed all drivers that they had to complete a supplemental form pertaining to the additional requirements by March 1, 2012, to be eligible to continue to work as an on-demand taxi driver.  Id.  Martin did not complete the supplemental form.  Id. ¶ 8.

On February 12, 2012, Martin allegedly formed an organization called the "Hawaii Taxicab Drivers Union" to "fight back [sic] any unfair, unjust conditions imposed on us [taxidrivers]."  See ECF No. 58-17.  One of the allegedly "unjust conditions" appears to have been the trip ticket increase. Referring to the Applications he signed, Martin alleges that "taxi drivers registered with Ampco have to sign a so-called contract" on a yearly basis, First Amended Complaint at 4, and that "Ampco ergo breaches contract when it changes the date to February 1, 2012 and illegally raises the ticket price from $4 to $5, unsupported by legitimate and proper process."  Id.

Ampco alleges that during the last few weeks of February 2012, Martin, along with Bill Nguyen, the owner of a local taxi company, attempted to force other on-demand drivers to join Martin's union and his protest against Ampco.  See Memo in Support of Motion, ECF No. 57-1, PageID #s 1767-68.  Ampco

4

submits the declarations of several individuals who say that Martin threatened them between late February and early March of 2012.  <u>See</u> Declaration of Lisi T. Lavea, ECF No. 58-9; Declaration of Efren Y. Guerrero, ECF No. 58-10; Declaration of Reginald J. DeVeas, ECF No. 58-11; Declaration of Jane Yeh, ECF No. 58-12.

On February 29, 2012, sheriffs arrived at Ampco's curbside lot and questioned Martin about his alleged threats. <u>See</u> Declaration of Abraham Martin, ECF No. 69-3.  Martin claims that Honda "called the Airport Sheriffs to lot A to arrest me." <u>Id.</u>  According to Martin, a sheriff approached and "told me that someone reported that I 'threatened.'"  <u>Id.</u>  Martin denies having been violent or having threatened anyone and accuses Ampco of having called the sheriffs in retaliation for Martin's protests. First Amended Complaint at 3, ECF No. 9-29. Neither party claims that the sheriffs took any further action or arrested Martin.

Ampco says that Martin's allegedly threatening behavior at the airport continued.  Lisi Lavea, an Ampco dispatcher, says that, on March 1, 2012, while allegedly attempting to get taxi drivers not to work at the airport, Martin drove by her and yelled, "You going die!"  Declaration of Lisi Lavea, ECF No. 58-8.  Lavea states that Martin then drove by her again and yelled, "You and Ampco going die!," then later jumped out of his car, approached her, and said, "I told you you and Ampco are dying!" <u>Id.</u>

Honda investigated the incident on behalf of Ampco. <u>See</u> Declaration of Karen Honda ¶ 10, ECF No. 58-1.  She says she spoke to several on-demand drivers who claimed they were threatened by Martin on or around March 1, 2012.  <u>Id.</u>  Allegedly believing the complaining drivers, Honda says she concluded that Martin had violated Ampco's Zero Tolerance policy for violence as expressed in Rule 2 of Ampco's Rules and Penalties procedure. <u>Id.</u>  This rule, which Martin acknowledges having received with his Application, states, in relevant part:

> In order to protect the health and safety of Ampco Express staff and all registered taxi drivers who work at the Honolulu International Airport, Ampco Express is putting all taxi drivers on notice that the Airport and Ampco Express have a Zero Tolerance Policy with respect to any type of creating, encouraging or participating in any type of disorder, fighting or violence, physical or verbal threats of bodily harm with or without a weapon at any Ampco Express location including but not limited to, Satellite Lots A & B, Curbside Stations 1 - 7, and the Ampco Express Office.
>
> Any taxi driver(s) caught violating this provision will be suspended pending investigation and findings.  Should there be a determination that this rule was in fact violated by one or both parties, based on the Zero Tolerance Policy, this would be grounds for revocation of your taxi permit to service the Honolulu International Airport.

2011 Rules and Penalties at 4, ECF No. 58-2.  Ampco says that because Martin violated Rule 2's Zero Tolerance policy for violence and physical or verbal threats, Ampco revoked his permit, giving him leave to apply for reinstatement in one year.

6

See Memo in Support of Motion, ECF No. 57-1, PageID # 1770; ECF No. 58-19.

Martin characterizes Ampco as having issued "a notice of revocation of work permit for one year, charging and accusing him of violation of its Rule 2 - Fighting - Violence - Weapons, just because he organized the strike at the State Capitol on that date [March 5, 2012]." First Amended Complaint ¶ 6. Martin says that he "of course did not commit any fighting, violence, and/or weapons whatsoever, at the airport or elsewhere." Id.

On April 30, 2012, Martin filed suit in state court against "Ampco Express," ECF No. 9-2, and attempted to serve the complaint and summons on Honda. See Defendant Ampco System Parking's Notice of Removal, ECF No. 1. The state-court judge quashed this summons and a later summons but granted Martin leave to amend the complaint. Id. On October 9, 2012, Martin filed an amended complaint in state court that named Ampco System Parking as a defendant.

Ampco removed the action to this court on November 5, 2012. See Notice of Removal, ECF No. 1.

Before the court is Ampco's Motion for Summary Judgment on Plaintiff's Amended Complaint ("Motion"). ECF No. 57. Ampco's Motion is GRANTED in part and DENIED in part.

The court grants summary judgment on Martin's first breach of contract claim (Count I) because he raises no issue of fact regarding Ampco's ability to increase the trip ticket price. To the extent Martin's claims for intimidation and harassment

7

(Count II), suppression and retaliation (Count III), and violation of constitutional rights (Count IV) arise under 42 U.S.C. § 1983, the court grants the Motion for Summary Judgment because Ampco is not a state actor.  To the extent Counts II and III arise under 42 U.S.C. § 1981, the court likewise grants summary judgment because the record contains nothing suggesting intentional racial discrimination.  The court also grants summary judgment on Martin's claims for intentional infliction of emotional distress in connection with the federal claims because Martin has failed to show the requisite outrageousness (Count V).

However, the court denies summary judgment on what is either Martin's second breach of contract claim or a tort claim relating to Ampco's allegedly retaliatory revocation of his permit (Count VI).  There is a question of fact as to the reasons for Ampco's revocation of Martin's permit.

**III.      STANDARD OF REVIEW.**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  See Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  The movants must support their position that a material fact is or is not genuinely disputed by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made

8

for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. See id. at 323. A moving party without the ultimate burden of persuasion at trial--usually, but not always, the defendant--has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

The burden initially falls on the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).

9

The nonmoving party may not rely on the mere allegations in the pleadings and instead must set forth specific facts showing that there is a genuine issue for trial.  T.W. Elec. Serv., 809 F.2d at 630.  At least some "'significant probative evidence tending to support the complaint'" must be produced.  Id. (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)); see also Addisu, 198 F.3d at 1134 ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact.").  "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial."  Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587).  Accord Addisu, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

In adjudicating summary judgment motions, the court must view all evidence and inferences in the light most favorable to the nonmoving party.  T.W. Elec. Serv., 809 F.2d at 631. Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party.  Id.  When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must

assume the truth of the evidence set forth by the nonmoving party with respect to that fact." Id.

IV.     **ANALYSIS.**

   A.  **Subject Matter Jurisdiction.**

   This court looks first at whether it has subject matter jurisdiction over this removed action. See Snell v. Cleveland, Inc., 316 F.3d 822, 826 (9th Cir. 2002) (holding that "a court may raise the question of subject matter jurisdiction, sua sponte, at any time during the pendency of the action").  When a case is removed to federal court, there is a strong presumption against removal. See Gaus v. Miles, 980 F.2d 564, 566 (9th Cir. 1992).  A defendant who has removed a case bears the burden of proving the propriety of removal, including jurisdiction.  See id.; Nishimoto v. Federman-Bachrach & Assocs., 903 F.2d 709, 712 n.3 (9th Cir. 1990).  "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."  28 U.S.C.    § 1447.

   This court has federal question jurisdiction given Count IV of the Complaint, which alleges that Ampco violated Martin's due process and First Amendment rights under the United States Constitution.  See Takeda v. Northwestern Nat'l Life Ins. Co., 765 F.2d 815, 821 (9th Cir. 1985) ("A case 'arises under' federal law only if the federal question appears on the face of the plaintiff's well-pleaded complaint.").  The court also has federal question jurisdiction over Counts II and III to the extent they assert § 1983 and § 1981 claims.

11

While the court could, because it has federal question jurisdiction, exercise supplemental jurisdiction over the state-law claims, see 28 U.S.C. § 1367, this court does not rely on supplemental jurisdiction here.  Independent of its federal question jurisdiction, this court has diversity jurisdiction over the state-law claims.

As Ampco notes, this action satisfies the requirements for diversity jurisdiction under 28 U.S.C. § 1332 because (1) there is complete diversity of citizenship between Plaintiff and Defendant; and (2) the amount in controversy exceeds $75,000. See Notice of Removal ¶ 5, ECF No. 1, PageID # 3.

First, complete diversity of citizenship exists in the present action because Martin is a citizen of Hawaii and Ampco is a citizen of California and Ohio.

Martin's citizenship is determined by his state of domicile.  See Kanter v. Warner-Lambert Co., 265 F.3d 853, 857 (9th Cir. 2001) ("[a] natural person's state citizenship is . . . determined by [his or] her state of domicile").  A person's domicile includes both physical presence and the intent to remain in that state.  Id.  The court considers a number of factors (with no single factor controlling) in determining a person's domicile:  "current residence, voting registration and voting practices, location of personal and real property, location of brokerage and bank accounts, location of spouse and family, membership in unions and other organizations, place of employment or business, driver's license and automobile registration, and

12

payment of taxes." See Lew v. Moss, 797 F.2d 747, 750 (9th Cir. 1986).

In alleging Martin's citizenship, Ampco points to Martin's own admission that he is a resident of Hawaii. Id., PageID # 5; First Amended Complaint at 1.  Although residence alone is not the equivalent of citizenship, "the place of residence is prima facie the domicile." State Farm Mut. Auto. Ins. Co. v. Dyer, 19 F.3d 514, 520 (10th Cir. 1994).  The record, in addition to showing Martin's physical presence in Hawaii, further suggests Martin's intent to make Hawaii his permanent home.  Martin was employed in Hawaii (see ECF No. 9-21); was a member of an organization located in Hawaii (the Hawaii Taxicab Drivers Union) (see ECF No. 17); and, as an on-demand driver, had a valid Hawaii driver's license (see ECF Nos. 58-15 and 58-16).

Ampco is a citizen of California and Ohio.  "A corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."  28 U.S.C. § 1332(c)(1).  The Supreme Court has held that the term, "principal place of business," refers to "the place where the corporation's high level officers direct, control, and coordinate the corporation's activities."  Hertz Corp. v. Friend, 559 U.S. 77, 92 (2010).  Ampco was incorporated in California and has its principal place of business in Cleveland, Ohio.  Notice of Removal ¶ 12, ECF No. 1, Page ID # 5.  Because Ampco and Martin are citizens of different states, there is complete diversity in this case.

Second, with respect to the amount in controversy in removal actions, the general rule under 28 U.S.C. § 1446 is, "If removal of a civil action is sought on the basis of the jurisdiction conferred by section 1332(a), the sum demanded in good faith in the initial pleading shall be deemed to be the amount in controversy."  See also Singer v. State Farm Mut. Auto. Ins. Co., 116 F.3d 373, 377 (9th Cir. 1997) ("The district court may consider whether it is 'facially apparent' from the complaint that the jurisdictional amount is in controversy.").  The Ninth Circuit notes the following "mechanical test" to determine the amount in controversy in a removal case when the complaint seeks a specific amount of damages:

> The district court simply reads the ad damnum clause of the complaint to determine whether the 'matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs.'  If the claim was 'apparently made in good faith,' then the sum claimed by the plaintiff controls for removal purposes unless 'it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed.'

Singer, 116 F.3d at 375 (citing 28 U.S.C. § 1332(a), which, in a now-superseded version, had a $50,000 amount in controversy requirement) (footnote and internal citation omitted).  See St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288–89 (1938) (stating that "the sum claimed by the plaintiff controls if the claim is apparently made in good faith" and that "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal"); Abrego Abrego v. The Dow Chem. Co., 443 F.3d 676, 683 (9th Cir.

14

2006) ("if the complaint filed in state court alleges damages in excess of the required federal jurisdictional amount, remand is warranted only if it appears to a 'legal certainty' that the claim is actually for less than the jurisdictional minimum").  If a complaint does not specify the required amount, a removing defendant must show, by a preponderance of the evidence, facts demonstrating that the amount in controversy meets the statutory requirement.  <u>Sanchez v. Monumental Life Ins. Co.</u>, 102 F.3d 398, 403-04 (9th Cir. 1996).

Martin's Complaint does specify damages that exceed the $75,000 jurisdictional threshold.  In his First Amended Complaint, he prays for "special, general, compensatory and consequential damages in an amount not less than $36,000," and treble and punitive damages against Ampco for $2,000,000.  <u>See</u> First Amended Complaint at 6.  "If made in good faith, punitive damages may be included in computing the amount necessary for federal jurisdiction."  <u>Davenport v. Mut. Ben. Health & Acc. Ass'n</u>, 325 F.2d 785, 787 (9th Cir. 1963) (citing <u>Young v. Main</u>, 72 F.2d 640 (8th Cir. 1934); <u>see also</u> <u>Gibson v. Chrysler Corp.</u>, 261 F.3d 927, 945 (9th Cir. 2001) ("It is well established that punitive damages are part of the amount in controversy in a civil action.") (citing <u>Bell v. Preferred Life Assur. Society</u>, 320 U.S. 238, 240 (1943)); <u>In re Ford Motor Co./Citibank (South Dakota), N.A.</u>, 264 F.3d 952, 963 (9th Cir. 2001) (recognizing punitive damages are relevant to determine the amount in controversy but

15

holding that punitive damages may not be aggregated in a class action if the underlying claims are individual).

Viewing Martin's Complaint as facially satisfying the jurisdictional threshold, this court next considers whether "it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed." Singer, 116 F.3d at 375.  Because the laws Martin appears to be bringing his claims under do permit recovery in excess of the jurisdictional threshold, the court concludes that he satisfies diversity jurisdiction.

As discussed below, this court construes several of Martin's claims as arising under 42 U.S.C. § 1983.  Section 1983 expressly permits the imposition of punitive damages against "every person" who, under color of law, intentionally deprives a plaintiff of his or her civil rights.  See 42 U.S.C. § 1983; Morgan v. Woessner, 997 F.2d 1244, 1255 (9th Cir. 1993).  A private corporation such as Ampco is a "person" within the meaning of § 1983 and thus can be sued for punitive damages. See, e.g., Comtronics, Inc. v. Puerto Rico Tel. Co., 409 F. Supp. 800, 806 (D.P.R. 1975); Croy v. Skinner, 410 F. Supp. 117, 123 (N.D. Ga. 1976).  Although the court ultimately grants summary judgment on those claims for failure to satisfy a statutory element of § 1983, the court cannot conclude that, as a jurisdictional matter, punitive damages cannot be taken into account.[1]

---

[1] According to the Ninth Circuit:

Only three situations clearly meet the legal certainty standard: (1) when the terms of a

This court has diversity jurisdiction over the state-law claims.  This is important here because it means that the court lacks the discretion it would otherwise have to remand the state-law claims to state court upon disposing of the federal claims.  See Colorado River Water Conservation Dist. v. U. S., 424 U.S. 800, 817-18 (1976) (stating that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them"); Williams v. Costco Wholesale Corp., 471 F.3d 975, 977 (9th Cir. 2006) (per curiam) (holding that district court had no discretion to remand state-law claims on federal-question grounds when court also had diversity jurisdiction).

### B. Federal Civil Rights and Constitutional Claims (Counts II-IV).

Because Martin is proceeding pro se, this court construes his pleadings liberally.  See Eldridge v. Block, 832 F.2d 1132, 1137 (9th Cir. 1987) ("The Supreme Court has instructed the federal courts to liberally construe the 'inartful pleading' of pro se litigants.") (citing Boag v. MacDougall, 454 U.S. 364, 365 (1982) (per curiam)).  Although Martin does not

---

contract limit the plaintiff's possible recovery; (2) when a specific rule of law or measure of damages limits the amount of damages recoverable; and (3) when independent facts show that the amount of damages was claimed merely to obtain federal court jurisdiction.

Popescu v. Jack Lalanne Fitness Centers, 983 F.2d 1077 (9th Cir. 1992) (citing Pachinger v. MGM Grand Hotel-Las Vegas, Inc., 802 F.2d 362, 364 (9th Cir. 1986)).

specify the authority under which he seeks relief, the court construes the claims for intimidation and harassment (Count II) and suppression and retaliation (Count III) as brought pursuant to 42 U.S.C. § 1983, or alternatively, 42 U.S.C. § 1981; his claim for violation of constitutional rights (Count IV) as brought pursuant to 42 U.S.C. § 1983; and his remaining claims as state-law claims.  The court first addresses Martin's federal claims.

### 1. Martin's § 1983 Claims.

Martin does not specify the facts on which his claims for intimidation and harassment (Count II), suppression and retaliation (Count III), and violation of constitutional rights (Count IV) are based.  Those claims in their entirety are as follows:

Intimidation and Harassment

II.  Ampco is in the business of intimidating and harassing taxi drivers, ever since it took over the taxi management at the airport.  It has been suspending drivers without due process of law, applying its one-sided and unconscionable rules and regulations.  It has ergo acted like a communist dictator by bringing in strong arms, security guards with guns and sheriffs to "scare" drivers, who are basically minority group, disadvantaged individuals.

Suppression and Retaliation

III. Ampco has also exerted suppression upon drivers who question and/or object [to] Ampco personnel's wrongful acts, such as selling "loads".  It would take any opportunity to retaliate against such drivers, by evil means.

18

<u>Violation of Constitutional Rights</u>

IV.   Ampco's dispute and appeal process is
only a circumvention of the law, since
it is done strictly by Ampco personnel
who are unknowledgeable, unprofessional,
prejudicial, etc. . . . and the last
step of the appeal is Mr. Steve Choo,
Ampco System Parking Regional Manager,
who has NEVER answered any of the appeal
letters for many years.  He is a very
irresponsible man.  Ampco ergo violates
due process, as stated in the Fourteenth
Amendment to the United States
Constitution.  Also, to Ampco,
exercising a Constitutional right to
strike (First Amendment)is in violation
of its Rule 6 - Unethical Practices.
Ampco has proven itself to be a
communist dictator in America.

First Amended Complaint ¶¶ 2-4.

The claims in their present form fail as a matter of

law because they do not allege that Martin personally suffered

the deprivation of a constitutional or statutory right.  <u>See</u>

<u>Idaho Conservation League v. Mumma</u>, 956 F.2d 1508, 1513 (9th Cir.

1992) ("In order to establish standing, '[a] plaintiff must

allege [1] personal injury [2] fairly traceable to the

defendant's allegedly unlawful conduct and [3] likely to be

redressed by the requested relief.'") (citing <u>Allen v. Wright</u>,

468 U.S. 737, 751 (1984)) (emphasis omitted).  Martin appears to

be bringing these claims on behalf of other drivers but, because

he is not an attorney, cannot assert claims on behalf of anyone

but himself.  <u>See</u> <u>Stoner v. Santa Clara Cnty. Office of Educ.</u>,

502 F.3d 1116, 1126 (9th Cir. 2007).

However, construing Counts II to IV liberally as

asserting claims for injuries Martin himself suffered based on

19

alleged conduct by Ampco and the DOT to suppress, harass, or retaliate against Martin for his exercise of his First Amendment and other rights, the court views Martin as bringing claims under § 1983 premised on Ampco's alleged violation of Martin's First Amendment rights (Counts II, III, and IV) or Fourteenth Amendment rights (Count IV).  See Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 283-84 (1977) (holding that retaliation by a state actor for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983 as a violation of the plaintiff's First Amendment rights).

Under 42 U.S.C. § 1983,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Although § 1983 typically establishes a civil action for the deprivation of constitutional rights by public officials, "even a private entity can, in certain circumstances, be subject to liability under section 1983." Villegas v. Gilroy Garlic Festival Ass'n, 541 F.3d 950, 954-55 (9th Cir. 2008) (citing Sutton v. Providence St. Joseph Med. Ctr., 192 F.3d 826, 835-36 (9th Cir. 1999)).  For "conduct by private parties to be under color of state law, it must be 'fairly attributable to the State.'" Collins v. Womancare, 878 F.2d 1145, 1151 (9th Cir.

1989) (citing <u>Lugar v. Edmondson Oil Co., Inc.</u>, 457 U.S. 922, 937 (1982)) (emphasis omitted).

In <u>Lugar</u>, the Supreme Court set forth a two-step test for determining whether state action by a private actor was sufficient to establish liability for a constitutional tort:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible . . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

<u>Lugar</u>, 457 U.S. at 937; <u>see also</u> <u>Villegas</u>, 541 F.3d 950, 954-55 (9th Cir. 2008) (invoking the <u>Lugar</u> test).

Thus, to state a § 1983 claim for a violation of the First and Fourteenth Amendments, Martin must show state action. <u>See</u> <u>Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n</u>, 531 U.S. 288, 295 (2001). The United States Supreme Court's cases "try to plot a line between state action subject to Fourteenth Amendment scrutiny and private conduct (however exceptionable) that is not." <u>Id.</u> at 295. "[S]tate action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" <u>Id.</u> (citing <u>Jackson v. Metro. Edison Co.</u>, 419 U.S. 345, 351 (1974)).

In <u>Brentwood</u>, the Court explained that "no one fact can function as a necessary condition across the board for finding

state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." Id. at 295-96. The Brentwood court articulated "a host of facts that can bear on the fairness of such an attribution." Id. at 296. For example:

> We have . . . held that a challenged activity may be state action when it results from the State's exercise of coercive power, when the State provides significant encouragement, either overt or covert, or when a private actor operates as a willful participant in joint activity with the State or its agents. We have treated a nominally private entity as a state actor when it is controlled by an agency of the state, when it has been delegated a public function by the State, when it is entwined with governmental policies, or when government is entwined in its management or control.

Id. (internal quotation marks, alterations, and citations omitted). See also Villegas, 541 F.3d at 955 (summarizing the relevant factors as whether "(1) the organization is mostly comprised of state institutions; (2) state officials dominate decision making of the organization; (3) the organization's funds are largely generated by the state institutions; and (4) the organization is acting in lieu of a traditional state actor.").

Martin concedes that Ampco is not a state actor under factors (1) and (3) of the Villegas test. See Reply Brief to ABM Parking Service, Inc.'s Supplemental Memorandum in Support of Motion for Summary Judgment ("Martin Supplemental Memo"), ECF No. 97, PageID # 2513.

Nor do factors (2) and (4) apply here. With regard to factor (2), which concerns state officials' domination of a private

entity's decisions, Ampco points to Article XXXII of the Agreement as evidence that the DOT does not dominate the decision-making of Ampco.  See Supplemental Memorandum in Support of MSJ, ECF No. 94. Article XXXII states:

> It is expressly understood and agreed by and between STATE and Concessionaire, that STATE shall in no way be nor for any purpose become or be construed to become a partner of Concessionaire in the conduct of its Concession business, or otherwise, or a joint venturer or a member of a joint enterprise with Concessionaire and STATE does not assume responsibility for Concessionaire's conduct or performance under this Concession Agreement. The provisions of Article VI (Concession Fee) hereof, relating to the percentage fee payable hereunder to STATE by Concessionaire are included therein solely for the purpose of providing a method whereby the concession fee is to be measured and ascertained. STATE and Concessionaire acknowledge and agree that there are no third-party beneficiaries to this Concession Agreement.

Id. at 67.  Ampco also points to the absence in the record of any evidence that the State, acting through the DOT, dictated Ampco's management of the airport taxi concession.

In response, Martin submits a compact disc of a July 10, 2012, Hawaii Senate Informational Briefing ("HSIB") on airport taxi service, which purportedly shows that Ampco's management of the taxi concession was dominated by the DOT.  Exhibit # 1, ECF No. 97. Neither the HSIB video nor any other evidence in the record suggests that Ampco is dominated by the State in making decisions relating to the operation of the airport taxi concession. In particular, the conduct Martin challenges--the management and disciplining of the on-demand drivers--does not appear to be

23

dominated by the State.  During the HSIB, Ford Fuchigami, the DOT's Deputy Director for the Airport Division, states, "We leave it to Ampco to go ahead and manage the taxi drivers.  That's what we hired them for"; "per our contract, it is their responsibility to manage the taxi drivers"; "The management of the taxi system is handled by Ampco.  So all the labor, dispatching, administrative work that goes with it all, Ampco is responsible for that."  Id. At another point in the hearing, when asked if the State could discipline the drivers, Fuchigami says, "Ampco has a series of different tiers in terms of violations of any one of these rules and they are the ones that actually enforce that."

This court turns now to factor (4), which examines whether a private entity is acting in lieu of a traditional state actor.  Ampco asserts that it is not acting in lieu of a traditional state actor by running the on-demand taxi concession. The court agrees.  Before the court is a state trial court order that states in some detail how private companies have run the on-demand taxi concessions at the Honolulu International Airport.  See Supplemental Memorandum in Support of Motion for Summary Judgment, ECF No. 94; Exhibit # 2, ECF No. 94-2.  The HSIB provided by Martin also corroborates this, with Fuchigami explaining that private taxi companies ran the concession before Ampco was awarded the contract. Exhibit # 1, ECF No. 97.  Martin does not rebut this evidence with anything suggesting that on-demand taxi services have been traditionally run by public actors in Hawaii or elsewhere.

None of these factors, therefore, establishes the close nexus between the State and the challenged action (Ampco's alleged harassment and retaliation against Martin for the exercise of his First Amendment rights) necessary to find state action.   <u>See</u> <u>Brentwood</u>, 531 U.S. at  295.

This court has taken pains to draw every reasonable inference in Martin's favor.  Thus, this court has considered the possibility of state action given evidence in the record that the State may have cooperated with Ampco in creating a point system to discipline drivers.  The first page of the 2011 Rules and Penalties reads in relevant part:

> Enclosed herein are the Ampco Express Rules and Penalties that have been reviewed by the State and will be in effect for the period of August 1, 2011 thru July 31, 2012 or until they have been suspended or repealed. . . .
>
> In order to make the rules and penalties fair and equitable across the board, Ampco Express and that [sic] State have created a point system whereby the subject taxi driver will be assessed a specified amount of demerit points and/or suspension.

<u>See</u> ECF No. 58-2.  It turns out that any involvement by the State in creating a point system is irrelevant to the present Motion.

At the hearing on this Motion, Ampco pointed out that it had disciplined Martin and revoked his permit pursuant to its Zero Tolerance policy rather than any point system.  Martin himself has submitted a letter dated March 5, 2012, from Honda that states that Martin's permit is being revoked under its Zero Tolerance policy for violating Rule 2.  <u>See</u> ECF No. 71-3.  While denying that he was

violent or threatening toward other drivers and a dispatcher, Martin does not claim that the point system was applied. Given the evidence before it, the court does not infer from the first page of the 2011 Rules and Penalties that the DOT/State was somehow involved in Ampco's disciplining of Martin.

Finally, this court considers the possibility of state action arising out of Martin's allegations in Count II that Ampco intimidated and harassed Martin with "security guards with guns and sheriffs." First Amended Complaint ¶ 2. To support his allegation that the State and Ampco conspired to silence Martin using State sheriffs, see Martin Supplemental Memo, ECF No. 97, PageID # 2514, Martin presents declarations by other drivers stating that, on February 29, 2012, sheriffs arrived with Honda and questioned Martin. See Declaration of Dung Le, ECF No. 69-1; Declaration of Sa Quach, ECF No. 69-2. Martin's own declaration says that one sheriff questioned him after someone had reported that Martin had threatened others. See Declaration of Abraham Martin, ECF No. 69-3.

Cases involving alleged joint police and private conduct typically require "a substantial degree of cooperative action" to support a finding of state action on the part of the private party. See Collins v. Womancare, 878 F.2d 1145, 1154 (9th Cir. 1989). Those cases tend to involve police officers who oversee or participate in a private citizen's self-help remedies such as a citizen's arrest, see, e.g., Collins v. Womancare, 878 F.2d 1145, 1154 (9th Cir. 1989); the repossession of property, see, e.g.,

Meyers v. Redwood City, 400 F.3d 765, 768 (9th Cir. 2005) (finding state action when police officer gave plaintiffs choice between allowing repossession of car or being arrested); or the eviction of tenants, see, e.g., Howerton v. Gabica, 708 F.2d 380 (9th Cir. 1983). In Howerton, for example, the court found that a landlord had acted "under color of state law" when he and a police officer engaged in "sustained, joint efforts to evict" one of the landlord's tenants. Id. at 385. The officer's unsolicited visits, recommendations to the tenants to leave, and later inquiry as to whether the tenants had found a new rental led the court to conclude that the officer's actions "created an appearance that the police sanctioned the eviction." Id. at 384.

However, the court went on to state that "[a] single request for the police to perform their peace-keeping functions may not be sufficient to make a landlord a 'joint actor' with the state for section 1983 purposes." Id. at 385. Moreover, in Collins, the Ninth Circuit noted that "merely complaining to the police does not convert a private party into a state actor." Collins, 878 F.2d at 1155; see also Fraser v. Cnty. of Maui, 855 F. Supp. 1167, 1177 (D. Haw. 1994).

The sheriffs' involvement here is insufficient to convert Ampco into a state actor. The record shows a single request for the sheriffs to perform their peace-keeping functions. Martin's own declaration states that the sheriffs' actions were limited to questioning him after receiving a complaint that he had threatened someone with violence. See Declaration of Abraham Martin, ECF No.

69-3.  There is no evidence that the sheriffs arrested Martin or did anything more than question him.  Furthermore, Ampco did not use the sheriffs to effect any self-help remedies, which is the common private party/law enforcement scenario in which courts have found state action by private parties.

Because the record does not support a finding of state action, Martin's § 1983 claims against Ampco fail.  It is therefore unnecessary to reach the question of whether Ampco's actions deprived Martin of any constitutional right.

Ampco is entitled to summary judgment on Count IV, and also on Counts II and III to the extent they state a § 1983 claim.

## 2. Martin's § 1981 Claim.

This court next considers whether Counts II and III, read liberally, assert a claim under 42 U.S.C. § 1981.  Section 1981 states in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  To state a claim under § 1981, Martin must allege that he suffered discrimination based on his race.  Parks School of Bus. Inc., v. Symington, 51 F.3d 1480, 1487 (9th Cir. 1995); Olivares v. Martin, 55 F.2d 1192, 1195-96 (5th Cir. 1977) (holding that a § 1981 complaint fails to allege jurisdiction

28

properly pursuant to 28 U.S.C. § 1343 when that complaint does not allege discrimination based on race).

In contrast to § 1983, § 1981 applies to private as well as state actors; that is, no state action is required.  Odom v. Columbia Univ., 906 F. Supp. 188, 194 (S.D.N.Y. 1995).  However, § 1981 is limited to claims of intentional discrimination.  Lowe v. City of Monrovia, 775 F.2d 998, 1010 (9th Cir. 1985); see also Gay v. Waiters' & Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531, 536 (9th Cir. 1982).

To the extent Counts II and III may be construed to state a claim of racial discrimination on the part of Ampco in violation of 42 U.S.C. § 1981, Martin does not produce any evidence of intentional racial discrimination by Ampco against him.  At most, Martin contends that Ampco attempted to "'scare' drivers, who are basically [sic] minority group, disadvantaged individuals." See First Amended Complaint ¶ 2.  This appears to be a description of the drivers, not a statement of what motivated Ampco.  Martin consistently alleges that he suffered harassment, intimidation, and retaliation because he attempted to exercise his First Amendment rights, not because of his race.

Summary judgment is therefore granted with respect to Martin's § 1981 claims, to the extent they are asserted, because the record is devoid of evidence, direct or circumstantial, that Ampco intentionally discriminated against Martin because of his race.

C.   **State-law claims (Counts I, V, and VI).**

1.   **Breach of Contract (Count 1).**

In Martin's first breach of contract claim, he alleges that his Applications constitute a contract between himself and Ampco that Ampco breached when it raised the trip ticket price from $4 to $5 in February 2012.  <u>See</u> ECF No. 58-13.  According to Martin, the price increase was "unsupported by legitimate and proper process."  <u>See</u> Amended Complaint ¶ 1.  In response, Ampco submits the two Applications signed by Martin, neither of which mentions the trip ticket price nor prohibits Ampco from changing the ticket price.  <u>See</u> ECF Nos. 58-15, 16.  The Applications do, however, include a provision in which Martin agrees to do the following:

> abide by all the laws, rules (Hawaii Administrative Rules-HAR), and policies and procedures which govern "on-demand" taxis operating at the Honolulu International Airport.  The policies and procedures as described in the "Procedures for Taxi Driver's Operating at the Honolulu International Airport" and "Rules and Penalties," **including any and all subsequent additions**."

<u>Id.</u> (emphasis added).  The document mentioned in this provision that states the trip ticket price is the "Procedures for Taxi Driver's Operating at the Honolulu International Airport" ("Procedures"), <u>see</u> ECF No. 58-3, which expressly states that it is governed by "executed concession agreements."  <u>Id.</u>  The Concession Agreement for the Taxi Management Concession at the Honolulu

30

International Airport Island of Oahu, signed by Ampco and the DOT, increased the trip ticket to $5, effective from 12:01 a.m. on February 1, 2012.  See ECF No. 58-4.

The Procedures also state that "it is each taxi driver's responsibility to make sure that they have read and are following all the current laws, rules, policies, and procedures."  See ECF No. 58-3.  Also in the record is a "January 29, 2012, Memorandum Re: 2011-2012 Registration-Supplemental Requirements," which Ampco says was distributed to Martin and the other on-demand drivers. That document indicates the trip ticket price.  See ECF No. 58-5.

Even if the Applications constituted a contract between Martin and Ampco, the record indicates that Ampco could raise the trip ticket price pursuant to the DOT/Ampco Concession Agreement, and that Martin agreed to be bound by such an increase.  Martin offers no evidence showing that Ampco agreed to keep the trip ticket price at $4.

Accordingly, the court grants Ampco's Motion for Summary judgment with respect to the breach of contract claim in Count I, which relates to the increase in the trip ticket price.

### 2.   Intentional Infliction of Emotional Distress Claim (Count V).

In Count V, Martin alleges that Ampco intentionally inflicted emotional distress in initiating his questioning by the sheriffs.  First Amended Complaint ¶ 5.  To recover for intentional

31

infliction of emotional distress, Martin must prove: (1) that the act allegedly causing the harm was intentional or reckless, (2) that the act was outrageous, and (3) that the act caused (4) extreme emotional distress to another." Hac v. Univ. of Hawaii, 102 Haw. 92, 106, 73 P.3d 46, 60-61 (2003). "An act is unreasonable if it is without just cause or excuse and beyond all bounds of decency[.] In other words, the act complained of must be outrageous." See Takaki v. Allied Mach. Corp., 87 Haw. 57, 66 n.13, 951 P.2d 507, 516 n.13 (1998). In explaining the type of "outrageous" conduct that gives rise to a claim for intentional infliction of emotional distress, the Hawaii Supreme court has noted:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Dunlea v. Dappen, 83 Haw. 28, 38, 924 P.2d 196, 206 (1996). "The question whether the actions of the alleged tortfeasor are unreasonable or outrageous is for the court in the first

instance, although where reasonable people may differ on that question it should be left to the jury." <u>Young v. Allstate Ins. Co.</u>, 119 Haw. 403, 429, 198 P.3d 666, 692 (2008).

The incident with the sheriffs is insufficient as a matter of law to amount to IIED.  Martin's own declaration states that a sheriff approached Martin and told him that someone had reported that he had threatened a person during his February protest.  <u>See</u> Declaration of Abraham Martin, ECF No. 69-3.  None of the declarations on this incident state that the sheriffs used physical force, arrested Martin, or did anything more than briefly question him.  Nor is there any evidence that Ampco knowingly made a false report to the sheriffs to induce them to question Martin.  The acts in issue by Ampco are not "so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  <u>Dunlea</u>, 83 Haw. at 38, 924 P.2d at 206.

Accordingly, the court grants Ampco's Motion for Summary Judgment with respect to Martin's claim for intentional infliction of emotional distress.

### 3.    Illegal Revocation of Work Permit for One Year (Count VI).

Count VI alleges that Ampco wrongfully revoked Martin's work permit for one year in violation of its independent contractor agreement with Martin.  Martin alleges that Ampco

33

revoked his permit in retaliation for his organizing of a strike. See First Amended Complaint ¶ 6. Ampco contends that it revoked Martin's work permit because he violated its Zero Tolerance policy against violence and threats, stated in Rule 2 of its 2011 Rules & Penalties.

Martin does not deny that he received a copy of the 2011 Rules & Penalties. That document provides:

> Ampco Express [has] a Zero Tolerance Policy with respect to any type of creating, encouraging or participating in any type of disorder, fighting, or violence, physical or verbal threats of bodily harm with or without a weapon at any Ampco Express location including, but not limited to, Satellite Lots A & B, Curbside Stations 1 - 7, and the Ampco Express Office.
>
> Any taxi driver(s) caught violating this provision will be suspended pending investigation and findings. Should there be a determination that this rule was in fact violated by one or both parties, based on the Zero Tolerance Policy, this would be grounds for revocation of your taxi permit to service the Honolulu International Airport. If necessary, law enforcement and/or Taxi Control will be notified of the offence and offending driver(s) will be prosecuted tot eh fullest extent of the law.

ECF No. 58-2. Ampco relies on Martin's 2011 Application, in which Martin acknowledges receipt of the 2011 Penalties & Procedures, and agrees to "abide by all the laws, rules (Hawaii Administrative Rules - HAR), and policies and procedures which govern 'on-demand' taxis operating at the Honolulu International Airport," including the "policies and procedures as described in

34

the . . . 'Rules and Penalties.'"   See ECF No. 58-16.   Martin
neither denies having received the 2011 Rules & Penalties nor
contests the authenticity of the 2011 Application signed by him
and offered as evidence by Ampco.

Martin does deny, however, that he threatened anyone at
the airport as alleged by Lavea and on-demand drivers Guerrero,
DeVeas, and Yeh.   See Opposition to Defendant Ampco System
Parking's Motion for Summary Judgment on Plaintiff's Amended
Complaint at 4 ("Opposition to MSJ"), ECF No. 66; see also
Declaration of Abraham Martin, ECF No. 67-1.   Martin instead
contends that he "was suspended just because he fought against
Ampco's wrongdoing."   Opposition to MSJ at 7, ECF No. 66.

To the extent Martin contests the legitimacy of Ampco's
reasons for revoking his permit, Martin raises a genuine issue of
fact.   The issue is whether the permit was revoked because Ampco
reasonably concluded that Martin had violently threatened someone
or because Martin had organized a boycott.   If Ampco did in fact
base the revocation on Martin's alleged violation of Ampco's Zero
Tolerance policy in Rule 2, Ampco was permitted to do that, given
Martin's agreement to be bound by Ampco's Penalties & Procedures.
See ECF No. 58-16.   Ampco appears to have followed Rule 2's
guidelines in first suspending Martin pending an investigation,
then revoking his permit when the investigation revealed that a

violation had occurred.  See Declaration of Karen Honda ¶¶ 10-13, ECF No. 58-1.

However, given the dispute about whether Ampco revoked Martin's permit in retaliation for his exercise of his First Amendment rights, Ampco is not entitled to judgment in its favor. Whether the revocation of Martin's permit was retaliatory is a key issue on which Count VI turns.  Accordingly, the court denies Ampco's Motion for Summary Judgment on Count VI.

Having denied summary judgment as to Count VI, the court is faced with the issue of whether Martin may seek punitive damages in connection with Count VI.  See First Amended Complaint at 6.  A "claim for punitive damages is not an independent tort, but is purely incidental to a separate cause of action."  Ross v. Stouffer Hotel Co., 76 Haw. 454, 466, 879 P.2d 1037, 1049 (1994). The legal theory underlying Count VI is unclear.  Count VI may be asserting that the revocation constituted a breach of contract, in which event punitive damages will not ordinarily be recoverable.  See Francis v. Lee Enterprises, Inc., 89 Haw. 234, 244, 971 P.2d 707, 708 (1999).  However, Martin may be inartfully asserting some kind of tort claim, the contours of which are less than clear.

The Motion does not brief this issue.  Ampco does not, for instance, assert that, notwithstanding its rules and the point system governing certain disciplinary decisions, it was

free to discharge Martin even if it did so in retaliation for his protest.  Ampco appears instead to be resting on denying that it took such retaliatory action.  For his part, Martin appears to be relying on circumstantial evidence of retaliation; that is, Martin appears to be saying he did not threaten anyone, so any evidence that he did do so was manufactured and should not have been accepted by Ampco.  The court is left with considerable confusion about the parties' legal theories and, under those circumstances, leaves the punitive damage issue for further proceedings.

## V.       CONCLUSION.

The court grants in part and denies in part Ampco's Motion for Summary Judgment.  Summary judgment with respect to Counts I to V is granted in favor of Ampco, but the court denies summary judgment with respect to Count VI.  Thus, Count VI, together with the issue of whether punitive damages are recoverable, remains for further adjudication.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, October 24, 2013.



 /s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge

Martin v. Ampco System Parking, Civil No. 12-00598 SOM/RLP; ORDER GRANTING IN PART AND DENYING IN PART AMPCO SYSTEM PARKING'S MOTION FOR SUMMARY JUDGMENT